Harry L. **REYNOLDS**, Jr.,
Plaintiff–Appellee,

v.

**INTERNATIONAL AMATEUR
ATHLETIC FEDERATION,**
Defendant–Appellant,

The Athletic Congress, et al., Defendants.

No. 93–3884.

United States Court of Appeals,
Sixth Circuit.

Argued March 10, 1994.

Decided May 17, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied July 7, 1994.

David J. Young, John R. Gall (argued and briefed), and Philomena M. Dane, Squire, Sanders & Dempsey, Columbus, OH, for plaintiff–appellee.

Eugene D. Gulland (argued and briefed), Martin Wald, Covington & Burling, Washington, DC, and Charles R. Saxbe, Chester, Hoffman, Willcox & Saxbe, Columbus, OH, for defendant–appellant.

Before: KENNEDY and MILBURN, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

The International Amateur Athletic Federation (IAAF) appeals the district court's de-

nial of its motion to quash garnishment proceedings and vacate a default judgment and permanent injunction previously entered by the district court. As it did before the district court, the IAAF argues on appeal that the district court had neither subject matter jurisdiction nor personal jurisdiction over the IAAF in the proceedings resulting in the default judgment and permanent injunction.

## I.

### A.

Harry "Butch" Reynolds is a world-class sprinter who regularly participates in international track and field meets. Reynolds currently holds the individual world record in the 400 meters, is a member of the world record holding 4×400 relay team, and is a gold and silver medalist from the 1988 Olympics.

On August 12, 1990, Reynolds ran in the "Hercules '90" meet in Monte Carlo, Monaco. Immediately after the competition, Reynolds was tested for illegal performance-enhancing drugs as part of a random drug test conducted after all international track meets. Two different samples of Reynolds' urine were sent to Paris for analysis. Each sample contained trace amounts of the steroid Nandrolone, a drug banned by international track regulations created by the IAAF.

The IAAF is an unincorporated association based in London, England, and is made up of track and field organizations representing 205 nations and territories. Its purpose is to coordinate and control track and field athletes and competitions throughout the world. The IAAF has no offices in the United States, and holds no track meets in Ohio, where Reynolds brought this action. One member of the IAAF is The Athletics Congress of the United States, Inc. (TAC), the United States national governing body for track and field.[1]

After Reynolds' positive drug test, the IAAF banned him from all international track events for two years, thereby eliminating his hopes for competing in the 1992 Olympics in Barcelona.

The IAAF issued a press release on November 5, 1990, stating that Reynolds was tested following the Monte Carlo meet and that "[t]he Paris laboratory revealed metabolites of the banned substance Nandrolone and a second analysis carried out on the 12th October 1990 confirmed their presence." The release went on to say that Reynolds had been suspended and offered a hearing by TAC, the date of which had not been set. American sports publications and newspapers picked up the release and reported Reynolds' suspension as news items.

### B.

Reynolds immediately brought suit in the Southern District of Ohio, arguing that the drug test was given negligently, and provided an erroneous result. The court dismissed one claim and stayed the remainder of the case after finding that Reynolds failed to exhaust administrative remedies provided by the Amateur Sports Act, 36 U.S.C. §§ 371–396 (1988) and TAC. Reynolds appealed the district court's decision. This court agreed with the exhaustion requirement but vacated the judgment and directed that the entire case be dismissed for lack of subject matter jurisdiction. *Reynolds v. TAC*, 935 F.2d 270 (6th Cir.1991)(Table).

In an attempt to exhaust his administrative remedies, Reynolds participated in an independent arbitration before an AAA panel in June of 1991. Reynolds took this action under the Amateur Sports Act and the United States Olympic Committee Constitution. The AAA arbitrator rendered a decision fully exonerating Reynolds; the arbitrator found strong evidence that the urine samples provided to the Paris laboratory were not Reynolds'. However, the IAAF refused to acknowledge the arbitrator's decision because the arbitration was not conducted under IAAF rules. Accordingly, the IAAF refused to lift Reynolds' two year suspension.

Reynolds then appealed his suspension to TAC, as required by IAAF rules. TAC held

---

**1.** TAC has recently changed its named to U.S.A. Track and Field. However, throughout these proceedings the name "TAC" is used, and we will continue to use it here.

a hearing on September 13, 1991. After thoroughly examining the evidence and deliberating for two weeks, the TAC Doping Control Review Board completely exonerated Reynolds, stating that

> after hearing the matters before it, the testimony of witnesses and expert witnesses of both sides, documents and exhibits, [we] find that Mr. Harry "Butch" Reynolds has cast substantial doubt on the validity of the drug test attributed to him.

Still not satisfied, the IAAF reopened Reynolds' case pursuant to IAAF Rule 20(3)(ii), which allows the IAAF to conduct an independent arbitration where it appears that one of its member foundations such as TAC has "misdirected itself." The IAAF arbitration was held on May 10 and 11, 1992, in London, England (the London Arbitration). The parties to the arbitration proceeding were the IAAF and TAC. Reynolds attended and testified at the hearing, and Reynolds' attorneys participated in the proceedings before the IAAF arbitration board, including examining and cross-examining witnesses. At the conclusion of the hearing, the IAAF arbitral panel found that the drug tests were valid, and that there was "no doubt" as to Reynolds' guilt. As a result, the panel upheld Reynolds' two year suspension.

## II.

### A.

Soon after the IAAF made its final decision, Reynolds filed the present action in the Southern District of Ohio alleging four different state law causes of action: breach of contract, breach of contractual due process, defamation, and tortious interference with business relations. Reynolds sought monetary damages, and a temporary restraining order that would allow him to compete in races leading to the U.S. Olympic trials on June 20, 1992. The IAAF refused to appear in the case, stating in a letter to Reynolds' attorney that the district court had no jurisdiction over the IAAF. The district court issued a temporary restraining order that prevented the IAAF from interfering with Reynolds' attempt to make the Olympic tryouts. Despite IAAF threats to both Reynolds and TAC, Reynolds ran in a few races and qualified to compete in the U.S. Olympic trials in New Orleans.

On June 17, 1992, the district court held a preliminary injunction hearing to decide if Reynolds should compete in the June 20 Olympic trials. The IAAF refused to appear, but TAC intervened to oppose Reynolds. On June 19, the district court issued a preliminary injunction after finding that it had personal jurisdiction over the IAAF and that Reynolds was likely to succeed on the merits of his claims. That afternoon, TAC filed a motion with the Sixth Circuit Court of Appeals, asking for an emergency stay of the district court's decision. At 7:00 that evening, Judge Siler granted the stay. *Reynolds v. IAAF*, 968 F.2d 1216 (6th Cir.1992)(Table). The next morning, Reynolds filed an emergency motion with Supreme Court Justice John Paul Stevens, asking for an order vacating Judge Siler's emergency stay. Justice Stevens granted Reynolds' request, finding that the District Court's opinion was "persuasive." *Reynolds v. IAAF*, —— U.S. ——, 112 S.Ct. 2512, 120 L.Ed.2d 861 (1992).

Despite these rulings, the IAAF announced that every athlete who competed with Reynolds at the U.S. Olympic trials would be ineligible to compete in the Barcelona Olympics. Reynolds' events were temporarily postponed while TAC filed an application to the full Supreme Court to vacate Justice Stevens' stay. The Court denied TAC's request, and Reynolds was eventually allowed to compete in the Olympic trials, after an agreement was reached between the U.S. Olympic Committee and the IAAF. Reynolds made the Olympic team as an alternate for the 400 meter relay. However, the IAAF refused to let Reynolds compete at the 1992 Olympics, and TAC removed him from the U.S. Olympic team roster. Moreover, the IAAF increased Reynolds' two year suspension by four months as punishment for participating in the U.S. Olympic trials.

### B.

On September 28, 1992, Reynolds filed a supplemental complaint with the district court, outlining the above events. The IAAF

did not respond to Reynolds' complaint and TAC did not appear in the default proceedings. After the IAAF was given full notice, the court entered a default judgment in Reynolds' favor. Soon afterward, the district court held a hearing to determine damages. Again, the IAAF was provided notice but refused to appear. On December 3, 1992, the district court issued an opinion awarding Reynolds $27,356,008, including treble punitive damages. The district court found that the IAAF "acted with ill will and a spirit of revenge towards Mr. Reynolds." Particular acts by the IAAF cited by the district court included "the suppression of evidence, threats levied against Reynolds and his fellow athletes, and the extension of Reynolds' suspension for an additional four months." More than $20,000,000 of the award was punitive damages for these acts.

The district court found that it had diversity jurisdiction in this case because Reynolds is a citizen of Ohio and the IAAF is a foreign association. The IAAF is an unincorporated association, and the district court reasoned that the IAAF is deemed to be a citizen of all states where its members are domiciled. *United Steelworkers of America v. R.H. Bouligny, Inc.,* 382 U.S. 145, 149–53, 86 S.Ct. 272, 274–76, 15 L.Ed.2d 217 (1965). The court held that diversity jurisdiction was proper because no IAAF members are citizens of Ohio.

The district court also found that it had personal jurisdiction over the IAAF. The court held that the Ohio long-arm statute was satisfied because the IAAF transacted business with Reynolds in Ohio, and the IAAF's public announcement of Reynolds' positive drug test adversely affected Reynolds in Ohio. The court held that the IAAF had the required minimum contacts with Ohio after finding that TAC acted as the IAAF's agent in the United States. *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731 (10th Cir.1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985)(A question of fact whether American member of international amateur basketball association is the agent of the international association).

### C.

On February 17, 1993, Reynolds began garnishment proceedings against four corporations with connections to the IAAF. The IAAF finally appeared at a garnishment hearing before the district court, and later filed a "Motion to Quash Garnishment Proceedings and To Vacate the Default Judgment" pursuant to FED.R.CIV.P. 60(b)(4). In its motion, the IAAF contended that the court lacked personal and subject matter jurisdiction. Before the motion was decided, the IAAF filed a recusal motion, arguing that previous opinions by the court put the district judge's impartiality into question.

The district court denied all motions on July 13, 1993. The court found that it had jurisdiction to overturn the IAAF's arbitration decision despite the United States' participation in the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention). *See* 9 U.S.C. § 201, *et seq.* The text of the Convention appears following 9 U.S.C.A. § 201 (West 1993). The Convention provides that recognition and enforcement of an award may be refused if it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Convention, Article V 1(e). The district court found that the Convention only applies where an agreement to arbitrate is in writing and signed by both parties—preconditions not present in the instant case.

The IAAF appeals from denial of its motions. Because it contends that the district court lacked jurisdiction in the earlier proceedings, the IAAF seeks to reverse the money judgment and injunction as well.

### III.

Because we have concluded that the district court lacked personal jurisdiction over the IAAF, the sole defendant in this case, it is not necessary to consider the other issues presented and argued by the parties.

### A.

The district court found that it had personal jurisdiction over the IAAF under Ohio's long-arm statute. Under this statute a non-

resident may be sued in an Ohio court on a cause of action arising from the nonresident's:

(1) Transacting any business in this state

\* \* \* \* \* \*

(3) Causing tortious injury by an act or omission in this state;

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct ... in this state

\* \* \* \* \* \*

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state.

Ohio Revised Code (O.R.C.) § 2307.382. The district court found the IAAF amenable to suit under subsection (1) on Reynolds' contract claims and under subsections (3) and (6) on his claims of defamation and tortious interference with business relations.

Without elaboration, the district court held that a contract existed between Reynolds and the IAAF, which the IAAF breached. This was the basis for personal jurisdiction under subsection (1), "transacting business" in Ohio. The court referred to correspondence between the IAAF's counsel and Reynolds' counsel and the appearance of a professor Donike who testified at the Doping Control Review Board hearing in Ohio that the tests upon which the suspension was based were valid. The district court also found that TAC was the IAAF's agent and that officers of TAC had repeatedly transacted business in Ohio.

With respect to the tort claims, the district court held that although the IAAF had issued the press release in Europe, it should reasonably have expected it to be disseminated in Ohio and should have anticipated that it would injure Reynolds in the state of his residence. Thus, according to the court, the IAAF should reasonably have expected to be "haled into court" in Ohio.

The district court recognized that, regardless of other considerations, a court's exercise of jurisdiction over a nonresident must satisfy due process. The district court found that the IAAF had "minimum contacts" with Ohio both through its own acts and those of its "agent" TAC. Referring to rules developed by this court in dealing with the due process issue in cases against nonresident defendants, the court held that the IAAF "purposefully directed" defamatory statements to Reynolds, knowing that he was a resident of Ohio and would suffer injury there. The court further held that Reynolds' cause of action arose in Ohio, reasoning that the breach of contract and financial consequences to Reynolds (loss of endorsements and appearance payments) were brought about solely by the IAAF's "transaction of business with Plaintiff in Ohio." Thus, according to the court, the IAAF "purposefully availed" itself of Ohio privileges by subjecting Ohio athletes to its rules and by gaining substantial financial rewards from the performances of these athletes.

The district court also held that the IAAF failed to make a timely objection to personal jurisdiction, thereby waiving the defense. Under F.R.C.P. 12(h), a party waives the right to contest personal jurisdiction by failing to raise the issue when making a responsive pleading or a general appearance.

### B.

When determining whether there is personal jurisdiction over a defendant, a federal court must apply the law of the state in which it sits, subject to constitutional limitations. *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir.1980). A court, therefore, must satisfy a two-pronged test: the defendant must be amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met. *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir.1972). As stated, the district court found that the IAAF was amenable to suit in Ohio under both the

"transacting business" and "tortious injury" clauses of the Ohio long-arm statute.

### 1. *Transacting Business*

The question of whether the IAAF submitted to personal jurisdiction through its alleged Ohio business transactions requires us to examine those transactions in light of due process principles because "it is a settled proposition of Ohio law that ... the [transacting business clause] was intended to extend to the constitutional limits of due process...." *Creech v. Roberts,* 908 F.2d 75, 79 (6th Cir.1990).

Under the Constitution, personal jurisdiction over a defendant arises from "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)(citations omitted). Depending on the type of minimum contacts in a case, personal jurisdiction can be either general or specific. *Third Nat'l Bank v. Wedge Group Incorporated,* 882 F.2d 1087, 1089 (6th Cir.1989). Reynolds relies on specific jurisdiction because he claims that jurisdiction arose out of the IAAF's alleged wrongful acts in Ohio. *Id.* at 1089.

The Sixth Circuit has established a three-part test for determining whether specific jurisdiction may be exercised:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*In-Flight Devices,* 466 F.2d at 226; *LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1299 (6th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).

#### (a)

Jurisdiction is proper under the purposeful availment requirement where "the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King Co. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Additionally, the defendant's conduct and connection with the forum must be of a character that he or she "should reasonably anticipate being haled into court there." *Id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). The district court found that the IAAF had created a "substantial connection" with Ohio through its "contract" with Reynolds and because of letters, calls and other incidental contacts made by the IAAF in Ohio.

The calls and letters from the IAAF consisted of a response to Reynolds' request for information and a letter sent to Reynolds stating that the IAAF did not accept the district court's jurisdiction. Also, Ollan Cassell, a TAC official who is a Vice–President of the IAAF, traveled to Ohio and repeatedly communicated with Reynolds regarding his suspension; and Professor Manfred Donike, a member of the IAAF Medical and Doping Commission, also appeared at a TAC Doping Control Review Board hearing against Reynolds in Ohio. Finally, Mark Gay, the IAAF's counsel, contacted Reynolds with regard to an IAAF hearing in May 1992. All of these contacts occurred after the issuance of the alleged defamatory statement and imposition of the suspension.

The district court gave no details of the "contract" between Reynolds and the IAAF other than the fact that all athletes who compete in international events are subject to IAAF rules, and the IAAF advances travel and expense money to those athletes. The record contains no evidence of any such advances to Reynolds, however.

#### (b)

Even if the IAAF purposefully availed itself of Ohio privileges, the claims against the IAAF must arise out of the IAAF's activities

in Ohio. The controversial urine sample was taken in Monaco, analyzed in France, and confirmed by an arbitration hearing in England. The district court found that the IAAF breached Reynolds' contract in Ohio, without conducting the analysis of this contractual relationship as required by *Burger King*.

### (c)

Finally, the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). In exceptional circumstances, this consideration may serve to establish the reasonableness of jurisdiction with a lesser showing of minimum contacts. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. A court should consider

> the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies.'

*Asahi Metal*, 480 U.S. at 113, 107 S.Ct. at 1033 (citing *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564).

The IAAF contends that holding it amenable to suit in an Ohio court would offend principles of international comity and put international cooperation at risk. Under this theory, the IAAF should not be required to bear the expense of litigating cases around the world when its only contact with a forum is an athlete's residence. Instead, the IAAF argues that only the courts of England, where it is located, have jurisdiction to review its arbitral proceedings. Reynolds counters that his interest in a convenient forum substantially outweighs the inconvenience to the IAAF. Over half of the IAAF's four year $174.5 million budget is received from United States corporations, one of the IAAF's officers resides in the U.S., and its other officers regularly visit the U.S.

### 2. *Tortious Injury*

Reynolds claimed that the false IAAF drug report was both defamatory and interfered with his contractual relationships. He contends that he lost three Ohio corporate endorsement contracts worth over $2,500,000, and appearance fees in Ohio worth over $1,500,000. For the IAAF to be amenable to suit in Ohio, the IAAF's tortious acts must satisfy both the Ohio long-arm statute and the three constitutional requirements discussed above.

The district court found the Ohio long-arm statute satisfied by the IAAF's tortious acts in Europe. Reynolds claims to have lost over $4,000,000 in Ohio because of the IAAF's allegedly false press release. Also, the district court specifically found that the injury to Reynolds was in Ohio, finding that "[t]he IAAF intentionally and purposefully directed their tortious acts toward Plaintiff, and such acts had a devastating effect upon Plaintiff."

The district court also held that the alleged defamatory statement that the IAAF made in England created minimum contacts in Ohio. Reynolds argues that his claims arose out of the IAAF's contacts with Ohio because the IAAF intentionally defamed him and interfered with his Ohio business relationships. Under this theory, the IAAF knew that the worldwide media would carry the report and that the brunt of the injury would occur in Ohio. *See Hugel v. McNell*, 886 F.2d 1, 5 (1st Cir.1989), *cert. denied*, 494 U.S. 1079, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990) (information given to *Washington Post* with intent to disseminate nationwide creates personal jurisdiction in New Hampshire, where the plaintiff lived and had an established reputation).

### IV.

 This court reviews issues of personal jurisdiction de novo. *Conti v. Pneumatic Products Corp.*, 977 F.2d 978, 985 (6th Cir. 1992). Nevertheless, this appeal is from denial of the IAAF's Rule 60(b) motion to set aside a default judgment. We review the denial of that motion under the abuse of discretion standard. *Amernational Industries, Inc. v. Action–Tungsram, Inc.*, 925

F.2d 970, 973 (6th Cir.), *cert. denied,* ——— U.S. ———, 111 S.Ct. 2857, 115 L.Ed.2d 1024 (1991).

## A.

The district court held that TAC was the agent of the IAAF and that TAC had sufficient minimum contacts with Ohio to bring the IAAF under the "transacting business" provisions of the Ohio long-arm statute. The IAAF insists that TAC, though a member of the IAAF, is an autonomous body that acts for itself within the United States. The record is to the contrary. TAC represents the IAAF in dealings with American athletes who participate in international events. Its bylaws state that "[t]he purposes of this Congress are to act as the national governing body for athletes in the United States, and to act as the IAAF member in the United States." TAC's president, Frank Greenberg, testified that TAC is "the exclusive representative of [the IAAF] in this country," and that "part of that obligation, part of being the named representative is that [TAC] must follow [IAAF] rules."

Furthermore, the facts in this case demonstrate the IAAF's control over TAC. After receiving the results of the two urine tests and after suspending Reynolds, the IAAF did not notify Reynolds. Instead it told TAC to notify Reynolds and look into the matter, even though the meet involved was sponsored by the IAAF. Reynolds requested documents directly from the IAAF, but the IAAF told Reynolds that all document requests must be made through TAC. As a result, all IAAF documents that Reynolds received came through TAC. Moreover, after the Supreme Court held that Reynolds could compete in the U.S. Olympic Trials, the IAAF told TAC to "take all necessary steps to ensure that Mr. Reynolds does not so compete." While it is true that TAC supported Reynolds at the London Arbitration, it was not there on his behalf, but as a member of the IAAF that was responding under the IAAF's rules. Thus, we agree with the district court that TAC is an agent of the IAAF.

Nevertheless, unless TAC had minimum contacts with Ohio in relation to the "con-

tract" between the IAAF and Reynolds, the court erred in premising jurisdiction of TAC's agency.

## B.

■ The Supreme Court has spoken with respect to the significance of a contractual relationship between an in-state plaintiff and an out-of-state defendant. The Court has held that a contract with an out-of-state party, standing alone, is not sufficient to establish minimum contacts. *Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185. Instead, to determine whether a party purposefully availed itself of a forum a court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing...." *Id.* at 479, 105 S.Ct. at 2185. In the instant case, there were no negotiations between Reynolds and the IAAF prior to "execution" of the contract. The IAAF arguably had a minimal course of dealing with Reynolds in Ohio, providing money to Reynolds in Ohio to travel to track events. However, there is no real evidence that a contract was negotiated in Ohio, created in Ohio, performed in Ohio, or breached in Ohio. *See Lak, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1300 (6th Cir.1989)(place where contractual obligation is incurred is important factor for determining personal jurisdiction), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).

Without further evidence concerning the purported contract, we are unable to agree that the district court had personal jurisdiction over the IAAF on the contract claims, either based on its own activities or those of TAC.

Moreover, the IAAF could not reasonably anticipate being sued in Ohio because of its alleged business dealings with Reynolds. It did not regularly transact or solicit business in Ohio or engage "in any other persistent course of conduct" there. O.R.C. § 2307.-382(A)(4). The IAAF cannot foresee being required to defend in every forum where one of its athletes is present. Reynolds' Ohio residence is merely fortuitous and "unilateral activity of [the plaintiff] is not an appropriate

consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). Instead, minimum contacts can only be formed by "an action of the defendant purposefully directed toward the forum State." *Asahi Metal Industry,* 480 U.S. at 112, 107 S.Ct. at 1032.

The IAAF's contact with Ohio through letters and phone calls was also insufficient to support jurisdiction. Reynolds asked the IAAF for information, but such unilateral action by a plaintiff does not render the defendant amenable to suit in the plaintiff's home forum. *Lak,* 885 F.2d at 1301; *American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1169 (6th Cir.1988). Moreover, "[t]he use of interstate facilities such as the telephone and mail is a 'secondary or ancillary' factor and 'cannot alone provide the minimum contacts required by due process.'" *Id.* (quoting *Scullin Steel Co. v. National Railway Utilization Corp.,* 676 F.2d 309, 314 (8th Cir.1982))(interior quotation marks omitted). Although various IAAF officials sent correspondence or made telephone calls to Ohio, these communications are insufficient to establish purposeful availment. *See, e.g., Market/Media Research v. Union Tribune Pub.,* 951 F.2d 102, 105 (6th Cir.1991), *cert. denied,* ––– U.S. –––, 113 S.Ct. 70, 121 L.Ed.2d 43 (1992)(telephone calls and mail sent to Ohio insufficient for personal jurisdiction); *Capital Dredge & Dock Corp. v. Midwest Dredging Co.,* 573 F.2d 377, 380 (6th Cir.1978)(same). It is the "quality" of such contacts, "not their number or their status as pre- or post-agreement communications" that determines whether they constitute purposeful availment. *Lak,* 885 F.2d at 1301 (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1194 (5th Cir.1985)). That quality is missing here.

In short, the IAAF is based in England, owns no property and transacts no business in Ohio, and does not supervise U.S. athletes in Ohio or elsewhere. Its contacts with Reynolds in Ohio are superficial, and are insufficient to create the requisite minimum contacts for personal jurisdiction.

Even if the IAAF purposefully availed itself of Ohio privileges, the claims against the IAAF must arise out of the IAAF's activities in Ohio. In general, "[a]n action will be deemed not to have arisen from the defendant's contacts with the forum state only when they are unrelated to the operative facts of the controversy." *Creech v. Roberts,* 908 F.2d 75, 80 (6th Cir.1990). The controversial urine sample was taken in Monaco, analyzed in France, and confirmed by an arbitration hearing in England. The district court found that the IAAF breached Reynolds' contract in Ohio, but there is no evidence of a contract made, performed, or breached in Ohio. Accordingly, Reynolds' contract claim did not arise out of the IAAF's contacts with Ohio. All of the activities relied upon by the district court as taking place in Ohio occurred after the activities in Europe upon which Reynolds bases his contract claims. These activities do not constitute a basis for finding personal jurisdiction under subsection (1) for "transacting business" in Ohio.

V.

The district court found that the IAAF was subject to personal jurisdiction under the provision of the Ohio long-arm statute which provides that a party is amenable to suit by "causing tortious injury in this state ... by an act outside this state." O.R.C. § 2307.382(A)(6). A tort action can be brought in the location where the injury is suffered. *Lachman v. Bank of Louisiana,* 510 F.Supp. 753 (N.D.Ohio 1981). Reynolds claimed a loss of more than $4,000,000 in Ohio because of the IAAF's false press release and the district court specifically found that the injury to Reynolds was in Ohio, holding "[t]he IAAF intentionally and purposefully directed their tortious acts toward Plaintiff, and such acts had a devastating effect upon Plaintiff." More needs to be demonstrated, however. The question remains whether the IAAF, in making the alleged defamatory statement in England, had minimum contacts with Ohio.

The leading case on this issue is *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder,* a profession-

al entertainer sued the writers and editors of a Florida magazine for libel in a California court. In concluding that the California court had personal jurisdiction, the Supreme Court reasoned that

> [t]he allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm ... was suffered in California. In sum, California is the focal point both of the story and the harm suffered.

*Id.* at 788–89, 104 S.Ct. at 1486. Because the defendants' intentional actions were aimed at California and the brunt of the harm was felt there, the Court concluded that the defendants could reasonably anticipate being haled into court in California. *Id.* at 789, 104 S.Ct. at 1487.

We find *Calder* distinguishable for several reasons. First, the press release concerned Reynolds' activities in Monaco, not Ohio. Second, the source of the controversial report was the drug sample taken in Monaco and the laboratory testing in France. Third, Reynolds is an international athlete whose professional reputation is not centered in Ohio. Fourth, the defendant itself did not publish or circulate the report in Ohio; Ohio periodicals disseminated the report. Fifth, Ohio was not the "focal point" of the press release. The fact that the IAAF could foresee that the report would be circulated and have an effect in Ohio is not, in itself, enough to create personal jurisdiction. *World–Wide Volkswagen Corp.*, 444 U.S. at 295, 100 S.Ct. at 566. Finally, although Reynolds lost Ohio corporate endorsement contracts and appearance fees in Ohio, there is no evidence that the IAAF knew of the contracts or of their Ohio origin. *Calder* is a much more compelling case for finding personal jurisdiction.

Reynolds argues, however, that his claims arose out of the IAAF's connection with Ohio because the IAAF intentionally defamed him and interfered with his Ohio business relationships. Under this theory, the IAAF knew that the worldwide media would carry the report and that the brunt of the injury would occur in Ohio.

Even accepting that the IAAF could foresee that its report would be disseminated in Ohio, however, the IAAF would not be subject to personal jurisdiction in Ohio. *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir.1990)(defendant's knowledge that independent publisher might publish defamatory statements in California does not create personal jurisdiction). The press release that the IAAF issued in London did not directly accuse Reynolds of using forbidden substances. It recited the fact that the Paris laboratory had reported a positive drug test and that Reynolds had been suspended and offered a hearing. We cannot hold that this act of the IAAF satisfied the requirements of the Ohio statute, or that permitting the IAAF to be sued in Ohio for the press release would comport with due process.

## VI.

■ Relying on F.R.C.P. § 12(h)(1)(waiver of defenses), the district court found that the IAAF waived its right to contest personal jurisdiction. See *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982)(failure of timely objection to personal jurisdiction can result in waiver of objection). We do not agree. Under F.R.C.P. 12(h), a party waives the right to contest personal jurisdiction by failing to raise the issue when making a responsive pleading or a general appearance. *See, e.g., In Re Wolverine Radio Co.*, 930 F.2d 1132, 1137 n. 5 (6th Cir.1991). However, courts have generally held that "[d]efects in personal jurisdiction ... are not waived by default when a party fails to appear or to respond." *Williams v. Life Saving and Loan*, 802 F.2d 1200, 1202 (10th Cir.1986). *See also Hugel v. McNell*, 886 F.2d 1, 3 n. 3 (1st Cir.1989)("[defendants] made no appearance prior to final judgment and thus never waived the defense of lack of personal jurisdiction"); *Pacific Atlantic Trading Co. v. M/V Main Exp.*, 758 F.2d 1325, 1331 (9th Cir.1985) (default judgment entered without personal jurisdiction is void). The IAAF did not file a responsive pleading or enter a general appearance. Ac-

cordingly, the district court incorrectly decided that the IAAF waived its personal jurisdiction defense by failing to appear until after the default judgment was entered.

■ The district court also held that the IAAF waived its objection to personal jurisdiction by reason of TAC's intervention in this action. After Reynolds lost in the London arbitration proceeding, he filed a motion for preliminary injunction to let him race in the United States Olympic Trials. The IAAF did not respond and did not appear at the injunction hearing, but TAC intervened as a defendant.

The key to determining whether the IAAF waived its personal jurisdiction defense through TAC's intervention is whether the IAAF authorized TAC to appear in its place. *Federal Deposit Ins. Corp. v. Oaklawn Apts.*, 959 F.2d 170, 175 (10th Cir.1992). In its request to intervene, TAC argued that it was required to uphold IAAF regulations, and contended that

> TAC, a member of the IAAF ... is bound by the decision declaring plaintiff ineligible; and thus under the Amateur Sports Act, TAC may not permit him to participate in the Olympic Trials.

TAC was carrying out its statutory duty under the Amateur Sports Act and was not acting as the IAAF's agent when it intervened. There is no indication that the IAAF authorized or even requested TAC to appear. Indeed, the IAAF had consistently refused to appear and had taken the position that the district court lacked jurisdiction over the entire proceeding. We conclude that TAC appeared solely in its role as the national governing body under the Amateur Sports Act.

### CONCLUSION

In conclusion, we do not believe that holding the IAAF amenable to suit in an Ohio court under the facts of this case comports with "traditional notions of fair play and substantial justice." *Asahi Metal Industry*, 480 U.S. at 113, 107 S.Ct. at 1033. The IAAF stated in its brief and at oral argument that it will not challenge the jurisdiction of English courts to determine the validity of the London Arbitration award if Reynolds seeks

to have it set aside in the courts of that country.

Our decision renders the IAAF's recusal motion moot.

The district court abused its discretion by denying the IAAF's Rule 60(b)(4) motion for relief. The judgment of the district court is **REVERSED.** Upon **REMAND** the district court will dismiss this action for lack of personal jurisdiction over the IAAF.